**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**LISA FURRY-ROBERTSON,**

       **Plaintiff,**

**v.**                                    **Civil Action No. 3:10CV110
(The Honorable John Preston Bailey)**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of Defendant, the Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Lisa Furry-Robertson ("Plaintiff") filed an application for DIB on July 28, 2006, alleging disability since March 15, 2005, due to degenerative disc disease, tennis elbow, and diabetes (R. 58, 94-96, 113)[1]. Plaintiff's applications were denied at the initial and reconsideration levels (R. 58, 59). Plaintiff requested a hearing, which Administrative Law Judge William H. Hauser ("ALJ") held on May 13, 2008 (R. 21-57). Plaintiff, represented by Lou Michaelson, a non-attorney advisor, testified on her own behalf (R. 5, 24-41, 49, 53-56). Also testifying was Vocational Expert Andrew

---

[1]At the administrative hearing, Plaintiff amended her onset date to April 11, 2006 (R. 51).

B. Beall ("VE") (R. 41-49). On July 2, 2008, the ALJ entered a decision finding Plaintiff was not disabled (R.12-20). On May 17, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-8).

## II. STATEMENT OF FACTS

Plaintiff was born on March 26, 1966, and was forty-two (42) years old on the day of the administrative hearing (R. 24). Plaintiff completed the eleventh grade of high school and subsequently earned her GED (R. 27). Plaintiff lived in a mobile home with her boyfriend and fourteen-year old daughter (R. 25). Plaintiff's past relevant work was as a picker for General Motors, a driver for a newspaper, and a bookbinding machine operator (R. 27-28, 114).

On January 8, 2004, Plaintiff presented to the emergency department of City Hospital of Martinsburg, WV, with complaints of low back pain. Upon examination, Dr. Larusso found Plaintiff's straight leg raising test was negative; she had normal deep tendon reflexes; her sensation was symmetrical; she ambulated with minimal difficulty. She was treated with Prednisone and Percocet (R. 240).

Plaintiff presented to Dr. Struthers on January 15, 2004, with complaints of low back pain. Dr. Struthers found "some paraspinal muscle spasm" and prescribed Voltaren and Flexeril and instructed Plaintiff to continue medicating with Neurontin (R. 314).

On February 2, 2004, Plaintiff presented to the emergency department of City Hospital with complaints of right elbow pain. She was diagnosed with epicondylitis[2] (R. 238).

Plaintiff presented to Dr. Struthers on March 8, 2004, with complaints of fatigue. She denied

---

[2]Epicondylitis: inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 637.

depression. She reported waking every couple hours. Plaintiff worked "shift work," from 3:00 p.m. to 3:00 a.m. Dr. Struthers prescribed Trazodone (R. 312).

Plaintiff presented to Dr. Struthers on March 26, 2004, for a "preop physical prior to undergoing elbow surgery" and was cleared for surgery (R. 311).

Plaintiff reported low back pain to Dr. Struthers on June 9, 2004. Plaintiff stated the pain had been present for one month and did not radiate to her hip or leg. Plaintiff rated her pain as six; it was the same level at all times; it did not increase or decrease when she sat, stood, or lay down; and heat did not reduce pain. She medicated with Flexeril, which provided "some improvement." Plaintiff also medicated with Glucophage, Nasonex, Prilosec, Avandia, and Glucotrol. Plaintiff's straight leg raising test was negative, motor strength in her lower extremities was normal, ankle jerks were present, and toe extension was equal. Plaintiff was positive for mild midline tenderness in her lower back with some mild paraspinal muscle tenderness. Dr. Struthers prescribed Celebrex, instructed Plaintiff to continue medicating with Flexeril, and ordered x-rays (R. 310).

The June 17, 2004, x-ray of Plaintiff's lumbar spine was normal (R. 264).

On June 24, 2004, Plaintiff presented to the emergency department of City Hospital with complaints of low back discomfort. Upon examination, Dr. Larusso noted Plaintiff's lower extremity strength was 5/5 and symmetric; capillary refill was immediate; distal pulses were present and symmetric; and deep tendon reflexes were 2+ bilaterally. There was no muscle atrophy. Dr. Larusso found Plaintiff had "injured her muscles in the low back," prescribed Lodine and Vicodin, instructed Plaintiff to apply heat to her back, and recommended physical therapy (R. 236-37).

Plaintiff was treated by Dr. Struthers for itching of her arms and legs related to diabetes. Plaintiff reported "some low back pain," for which she was receiving therapy (R. 309).

3

The July 29, 2004, x-ray of Plaintiff's sacroiliac joints was normal (R. 253).

Plaintiff's August 6, 2004, MRI of her lumbar spine showed degenerative disc disease from L3 to S1. "The findings [were] most notable at L5-S1 where there [was] a moderate sized left paracentral disc protrusion" (R. 208, 252).

On September, 9, 2004, Plaintiff reported low back pain to a physician at City Urgent Care. She had negative straight leg raising test. She was prescribed Ultracet (R. 164).

Plaintiff's September 18, 2004, CT scan of her head was unremarkable (R. 207).

On October 13, 2004, Plaintiff reported low back pain to a physician at City Urgent Care. She was prescribed Ultracet (R. 166).

On October 14, 2004, Plaintiff requested the physician at City Urgent Care reduce her to light-duty work. She was limited to no lifting over ten pounds (R. 165).

On June 18, 2005, Plaintiff presented to the emergency department of City Hospital with a right toe injury. She was treated for a contusion and told to treat her pain with Tylenol or Advil and keep her foot elevated. She was told her injury could "potentially be an occult fracture present but that the presence of such a fracture would not change the management of her injury" (R. 226).

On June 25, 2005, Plaintiff returned to the emergency department of City Hospital for treatment to her right toe. Dr. Larusso informed Plaintiff that if her toe were fractured, "management" of the injury would not change. An x-ray was made, which showed a fracture of the head of the second proximal phalanx. She was prescribed Percocet and instructed to keep her foot elevated and taped (R. 225, 248).

On January 10, 2006, Plaintiff presented to the emergency department of City Hospital with "body aches." Dr. Cackovic diagnosed acute myalgias, mild hyponatremia and hyperglycemia.

Plaintiff was treated with saline (R. 223-24).

On February 7, 2006, Plaintiff presented to the Shenandoah Valley Medical System with complaints of low back pain that radiated down her left leg. Plaintiff reported she had had steroid epidural injections. Plaintiff had negative leg raising test results, pain with palpation at "L1-L," [sic] and paraspinal tenderness with palpation. She was prescribed Diclofenac and Flexeril (R. 303).

Plaintiff presented to the emergency department of City Hospital on February 8, 2006, with complaints of back pain, which had persisted for "several days" and which radiated into her left leg. Plaintiff stated she had been treated at Shenandoah Valley Medical Center on February 7, 2006, had been prescribed Flexeril and Lortab, and these medications were not easing the pain. Plaintiff had full range of motion and 5/5 motor strength upon examination. Distal pulses were present and symmetric; her capillary refill was immediate; her skin was warm; the straight leg raising test "seem[ed] to produce only back pain"; and she could lie down and sit up "without difficulty" (R. 221). Plaintiff was instructed to discontinue Lortab and keep medicating with Flexeril. Plaintiff was prescribed Percocet and instructed to take Ibuprofen and do stretching exercises. She was discharged "in good condition" (R. 222).

On February 11, 2006, Plaintiff presented to City Urgent Care for low back pain. She stated Flexeril, Lortab and Percocet did not help her pain. Plaintiff's heel-toe gait was normal. Her flexion, extension and lateral ends were reduced. She had no sciatic notch tenderness, spasm, edema, or discoloration. She was prescribed Ultracet and instructed to rest (R. 164).

Plaintiff's February 14, 2006, lumbar spine MRI showed "[d]egenerative changes at several levels but most pronounced at L5-S1, where there is a posterocentral disc protrusion and left neural foraminal narrowing." Moderate neural foraminal narrowing was observed at L4-L5; moderate left

neural foramen at L3-L4 was noted (R. 247).

On February 28, 2006, Dr. Yalamanchili completed a neurosurgical consultation of Plaintiff. Plaintiff reported "a 3 or 4 week history of severe left leg pain," which radiated down her left leg into her ankle. Exercise aggravated Plaintiff's pain; rest relieved it. Plaintiff reported her pain was eight on a scale of one-to-ten. Plaintiff's motor strength was 5/5 in her legs. She had "diminished pinprick along the lateral aspect of her left leg." Her reflexes were 2+ with an absent left ankle jerk. Plaintiff's straight leg raising sign was positive at twenty (20) degrees. Her gait was antalgic and her Patrick's maneuver was negative. Dr. Yalamanchili reviewed Plaintiff's February 14, 2006, MRI and found she had a disk herniation at L5-S1, "effecting the descending left S1 root." He diagnosed left S1 radiculopathy and L5-S1 disk herniation. Dr. Yalamanchili ordered Plaintiff to undergo physical therapy for four weeks (R. 270).

On March 7, 2006, Plaintiff reported to Physical Therapist Klingensmith, at Premier Physical Therapy & Sports Medicine Center, that, two-to-three weeks earlier, she "develop[ed] . . . insidious onset of pain" in her left leg. Due to the pain, Plaintiff reported, Dr. Yalamanchili had ordered a MRI , which showed a herniated disc L5/S1. Plaintiff described her pain as constant, varied from dull to sharp, and radiated to her left buttock and leg to her heel (R. 173). Plaintiff was positive for pain and spasm, upon palpation, of her left paraspinals from L to S1. Plaintiff's strength was normal. Plaintiff's range of motion extension was "minimally limited with some discomfort." Her straight leg raising test was painful at thirty (30) degrees (R. 174).

Dr. Yalamanchili examined Plaintiff on March 23, 2006, for low back pain. Plaintiff reported neither the physical therapy nor the epidural steroids relieved her pain. Plaintiff's straight leg raising test was abnormal on the left. Plaintiff's palpation test of her low back and reflexes were

normal. Her sensation pin prick test was diminished in her "left S1." Plaintiff's lower extremity muscle strength was 5/5 (R. 271). Dr. Yalamanchili diagnosed lumbosacral radiculitis. He informed Plaintiff that he "would recommend a simple diskectomy for now. If her back pain persist[ed] over the next three months or so, she may need to come back for a lumbar fusion at L5-S1" (R. 272).

On April 11, 2006, Plaintiff presented to the emergency department of City Hospital with complaints of back and left leg pain. Plaintiff's motor strength was 5/5 in her legs. The sensory exam showed diminished pin prick on the left leg. Reflexes were 2+ with 1+ ankle jerks. Plaintiff's gait was antalgic. It was noted that Plaintiff's recent MRI showed a herniated disc at L5/S1. A L5/S1 diskectomy was ordered (R. 214, 219).

Dr. Yalamanchili performed a L5/S1 diskectomy on Plaintiff on April 11, 2006 (R. 216, 218).

On April 18, 2006, Plaintiff reported to Dr. Yalamanchili that she experienced "a lot of pain in her left buttock," which did not radiate down her leg. Plaintiff's straight leg raising test was negative; her motor strength was 5/5; her gait was normal. Dr. Yalamanchili diagnosed "postop spasm." He instructed Plaintiff to "increase her activities over the next few weeks." Dr. Yalamanchili prescribed Valium and ordered physical therapy (R. 274).

On April 25, 2006, Plaintiff presented to Dr. Yalamanchili with complaints of "more left leg pain now." Plaintiff's straight leg raising test was negative; her motor strength was 5/5; her gait as normal but antalgic; her incision was well healed. Dr. Yalamanchili ordered physical therapy for two (2) weeks. He prescribed Percocet. He noted that if her symptoms did not improve, he would order a MRI of her lumbar spine "to rule out a recurrent disk herniation, but . . . with her negative straight leg raising sign, [he] [thought] this [was] more muscular" (R. 275).

On April 27, 2006, Plaintiff reported to Premier Physical Therapy & Sports Medicine Center

for post-discectomy surgery. Plaintiff stated her "left leg pain [was] the same as it was before surgery," but her low back pain was "not as bad as it was before surgery." Plaintiff's goal was to "get rid of the pain" and "ride a motorcycle again" (R. 171).

Plaintiff's flexion was fifty (50) percent; extension was twenty-five (25) percent; right side bending was seventy-five (75) percent; left side bending was fifty (50) percent. Her lower extremity strength was 5/5, bilaterally. Plaintiff's left straight leg raising test was positive; her right straight leg raising test was normal (R. 171).

On May 16, 2006, Plaintiff returned to Dr. Yalamanchili for a follow-up examination. Plaintiff reported "still having some pain down her left leg." Plaintiff described her pain as sharp and stabbing. Plaintiff stated her pain was aggravated by exercise and relieved by rest. Plaintiff's straight leg raising test was positive on the left at "about 30 degrees." Plaintiff's Patrick's maneuver was negative. Dr. Yalamanchili opined that he "would like to repeat her left L5 nerve root block," which would be "done in the near future" (R. 276).

On June 6, 2006, Dr. Yalamanchili examined Plaintiff due to complaints of continued left leg pain. Plaintiff's straight leg raising test was negative; her motor strength was 5/5. Dr. Yalamanchili ordered a MRI (R. 277).

On June 27, 2006, Dr. Yalamanchili reviewed Plaintiff's MRI. He found "she ha[d] a recurrent left L5-S1 disk herniation along with scar tissue affecting the left S1 nerve root." He opined Plaintiff had degenerative disk disease at L5-S1 "with modic changes of the endplates." Plaintiff continued to complain of severe pain in her back and left leg. Plaintiff's straight-leg raising test was positive on the left at twenty (20) degrees; her Patrick's maneuver was negative; her gait was antalgic; she had "reproduction of back pain to flexion or extension of her lumbar spine." Dr.

Yalamanchili recommended Plaintiff undergo a L5-S1 recurrent discectomy and transforaminal lumbar interbody fusion; Plaintiff agreed to the procedures.

On July 17, 2006, Plaintiff was hospitalized at Frederick Memorial Hospital, where Dr. Yamanchili performed a L5-S1 recurrent diskectomy, a left L5-S1 transforminal lumbar interbody fusion with posterior instrumentation, and lateral arthrodesis with infuse and autograft (R. 176, 179-80, 181, 182-83,185, 188-89, 190). Prior to the surgery, it was noted that Plaintiff had undergone a "previous L5-S1 diskectomy several (sic) ago." She had recently experienced "severe pain going down her left leg again." Plaintiff treated the pain with physical therapy and epidural steroid injections "without relief." It was noted that Plaintiff's "MRI scan . . . show[ed] recurrent left L5-S1 disk herniation along with severely degenerated disk at L5-S1 with [m]odic changes of the endplates." Plaintiff's motor exam was 5/5 in her legs. There was "diminished pinprick on the lateral aspect of her left leg and foot." Plaintiff's reflexes were "2+ with an absent left ankle jerk." Her straight leg raising test was negative on the right and positive on the left at twenty (20) degrees. Plaintiff had "reproduction of back pain to flexion or extension of her lumbar spine." Plaintiff's gait was antalgic. She was diagnosed with "left L5-S1 recurrent disk herniation along with degenerative disk disease" (R. 177, 186).

The June 20, 2006, MRI of Plaintiff's lumbar spine showed "recurrent disc in a posterocentral location at L5-S1." No post-operative change was noted; "some enhancing soft tissue in the left neural foramen at L5-S1" was observed and was "likely to improve over time." It was noted that Plaintiff "may benefit" from epidural steroid injections at L5-S1 (R. 245).

Plaintiff was released on July 19, 2006, with "detailed wound care and follow up

instructions" (R. 176).

On July 23, 2006, Plaintiff presented to the emergency department of City Hospital with complaints of low back pain. Dr. Cackovic noted Plaintiff had no numbness, tingling, or weakness in her extremities. Plaintiff reported her pain was "persistent" and she medicated with "two Percocet every four hours with no relief." Plaintiff stated her pain was "improved with heat from a shower" (R. 212). Dr. Cackovic's examination of Plaintiff's back revealed "no bony midline thoracic or lumbar tenderness to palpation"; "large vertical midline incision in the lumbar spine from recent surgery," of which the superior aspect was positive for erythema and warmth; no abscess or drainage; no restricted range of motion at her waist; and a "significant amount of ecchymosis in the dependent portions of her buttocks and waist" (R. 212-13). Plaintiff's motor strength was 5/5 in her lower extremities; her deep tendon reflexes were 2+ bilaterally (R. 213).

Plaintiff was treated with injections of Dilaudid with Phenergan, which, according to Plaintiff, "significantly improved her symptoms." Dr. Cackovic prescribed Keflex to inhibit "possible cellulitis [from] evolving at the site of recent surgery" (R. 213).

On August 1, 2006, Plaintiff presented to Shenandoah Valley Medical System for follow up on her abnormal EKG. Dr. Struthers noted there was "very minimal T wave abnormality in V2 . . . ." Dr. Struthers also noted she would "check Echo" (R. 301).

Plaintiff's August 9, 2006, echocardiogram was "technically adequate normal" (R. 211).

Plaintiff's August 12, 2006, lumbar spine CT scan showed "[s]tatus-post left sided fusion of L5 and S1. The alignment of the spine and hardware [were] anatomical. The pedicle screws and the spinous process clamp appear[ed] well positioned. Again noted [was] soft tissue material filling the left neural foramen and left lateral recess at L5-S1 level, representing either disc or scar tissue.

On the previous MRI done on 6/20/06, there was a recurrent disc in this area" (R. 243).

Plaintiff reported to the emergency department of the City Hospital on August 19, 2006, with complaints of foot pain. Plaintiff stated the pain in her left foot had lasted for two weeks. She had no numbness, tingling, swelling, or erythema. Plaintiff reported she had had surgery on her back, which did not help. She continued to have back pain, which radiated down her left leg (R. 209). The x-ray of Plaintiff's left foot was normal (R. 242).

Plaintiff reported she smoked two packages of cigarettes per day; she consumed no alcohol; she used no recreational drugs. Plaintiff did not appear to be in any acute distress; Dr. Rosanna noted, upon his entering the examination room, Plaintiff was "actually sleeping and snoring" (R. 209). Upon examination, Plaintiff's left foot was "tender diffusely mostly in the dorsal surface." Plaintiff's dorsalis pedal pulses were intact; her sensation to light touch was intact; her capillary refill was less than two seconds; she was able to wiggle her toes; she could plantar flex and dorsiflex her ankle; her left ankle was nontender. Dr. Rosanna ordered an x-ray. Plaintiff was released to home and instructed to continue medicating with Dilaudid and to follow-up with Dr. Struthers (R. 210).

On August 26, 2006, Plaintiff completed a Function Report – Adult. She asserted she took naps "on and off[,] lay with a heating pad on [her] back, visit[ed] friends and family once in a while" (R. 122). Plaintiff wrote that she cared for her child by washing her clothes and preparing dinner for her, cared for her pets by feeding and watering them and letting them go outside, but her brother-in-law cared for her pets "most of the time." Plaintiff wrote that prior to her back impairment she was able to ride a motorcycle, bend to shave her legs, and stand and sit for long periods of time.

Plaintiff asserted her sleep was affected by her illness/injury because she was "up every couple hours due to pain." As to Plaintiff's ability to care for her personal needs, she wrote she

could not bend to put on pants "without a lot of pain"; could not bathe as she had a difficult time "getting up to get out of tub"; had difficulty getting up from a seated position. Plaintiff could care for her hair, feed herself, and use the toilet "fine" (R. 123). Plaintiff asserted she had prepared meals "only couple of times" since surgery because she could not stand for long periods of time. Plaintiff wrote she did laundry for a "couple hours 2 times a" week (R. 124). Plaintiff asserted she did not do house or yard work because of pain. She went outside "once or twice a day," drove a car, and shopped for groceries once a week for three hours. Plaintiff managed money (R. 125). Plaintiff wrote she no longer swam or rode a motorcycle because she could not "climb a lot of steps" and could not "hold motorcycle up steady" because of pain. Plaintiff asserted she stood and talked or sat and talked with others once a day (R. 126). Plaintiff could not "go anywhere that much due to pain and medication" (R. 127). She could walk about twenty feet before needing to rest, could pay attention for ten-to-fifteen minutes, did not finish what she started, could follow written and spoken instructions, got along well with authority figures, did not handle stress well, handled changes in routine in a "so so" manner, and was "very impatient short tempered" (R. 127-28). In the "Remarks" section, Plaintiff wrote she was "very limited" in what she could do "because of pain, motin (sp.) in back due to implants" and fatigue (R. 129).

On September 7, 2006, Plaintiff's chief complaint to Dr. Yalamanchili was "increasing left leg pain and weakness" and urine retention. Dr. Yalamanchili noted that Plaintiff had been advised to have surgery for a "soft tissue mass out in the left L5-S1 foramen," but she did not want to have that surgery until she received approval from her insurance company. She was placed on a Medrol dose pack and "was suppose to return to . . . [Dr. Yalamanchili's] office in about two weeks; however, she came in this morning stating that she is now having difficulty in lifting her left foot up

12

off the ground." Dr. Yalamanchili admitted Plaintiff for a lumbar fusion. Dr. Yalamanchili informed Plaintiff that "she may now have a permanent disability because of the failure of the insurance company to approve her surgery on time" (R. 194, 198).

On September 7, 2006, Plaintiff was admitted to Frederick Memorial Hospital for "removal of posterior instrumentation, exploration of her arthrodesis, L5-S1 foraminotomy and replacement of her hardware." It was noted that, post-operatively, Plaintiff "had immediate relief from her leg pain." "She was ambulating without any assistance" the afternoon of the surgery. Her motor strength was 5/5 in both legs (R. 193, 197).

A MRI of Plaintiff's lumbar spine, on the day of the surgery, showed the following:

There is metallic streak artifact from transpedicular screw and rod fixation at the L5-S1 level. There is decreased T1 and increased T2 signal seen from the L5-S1 level, with enhancement seen for the end plates and possibly of the intervening disc and the possibility of spondylodiskitis could not be excluded, although this may represent postoperative change.

At L3-4, there is mild broad disc bulge with posterior element hypertrophic change effacing the ventral thecal sac and causing mild bilateral neural foraminal stenosis inferiorly.

At L4-5, there is a broad disc bulge with right lateral disc protrusion and posterior element hypertrophic change, effacing the ventral thecal sac causing right neural foraminal stenosis.

At L5-S1, there is a central disc protrusion. In addition, there is enhancing left epidural signal most compatible with scar, appearing to cause mass effect upon the left S1 nerve root and marked mass effect of the left neural foramen.

The rest of the lumbar spine levels appear unremarkable.

Impression: Postoperative and degenerative changes as discussed. A recurrent disc protrusion at L5-S1, as well as extensive enhancing scar at the L5-S1 level with mass effect as noted above. In addition, there is enhancement of the end plates at L5-S1 and the possibility of spondylodiskitis could not be excluded, and clinical correlation is advised (R. 203-04).

Dr. Yalamanchili's pre-operative and post-operative diagnoses were for "pseudoarthrosis and left L5-S1 recurrent disk herniation" (R. 195).

On September 8, 2006, Plaintiff was discharged to home (R. 193).

On September 9, 2006, Plaintiff presented to Dr. Yalamanchili with complaints of "continued severe pain in her left leg." She reported mild weakness in her left leg and foot. Plaintiff's straight leg raising test was positive on the left at twenty (20) degrees; her Patrick's maneuver was negative; her gait was antalgic. Dr. Yalamanchili opined he would "continue with conservative measures" in treating Plaintiff; however, if Plaintiff's symptoms persisted, he noted she may "require surgical intervention" (R. 279).

On September 12, 2006, Plaintiff reported to Dr. Yalamanchili that she had a "slight leakage of bloody fluid" from her incision. Dr. Yalamanchili found Plaintiff's incision was well healed. He prescribed Valium and pain medication (R. 280).

On October 10, 2006, Plaintiff presented to Dr. Yalamanchili with complaints of "swelling over the top of her left foot." Plaintiff's straight leg raising test was negative; her motor strength test was 5/5; her range of motion was "good" in "all toes of the left foot." Plaintiff's gait was normal and steady. Dr. Yalamanchili prescribed Dilaudid. He ordered a CT scan and MRI (R. 282).

A MRI of Plaintiff's lumbar spine was taken on October 10, 2006. It showed the following:

Extensive end plate edema and slight enhancement of the L5-S1 disc space. This is probably post-operative change, but it is difficult to completely exclude discitis/osteomyelitis. Clinical correlation recommended. Aspiration can be performed if clinically indicated.

Extensive granulation tissue and/or epidural fibrosis at L5-S1 on the left affecting the L5 and S1 nerve roots. No evidence for recurrent disc herniation.

Mild disc abnormalities at L3-L4 and L4-L5 (R. 206).

On October 12, 2006, Plaintiff underwent a CT scan of her lumbar spine. It showed "evidence of a large amount of soft tissue density material in the left side of the epidural space at L5-S1, extending into the left lateral recess, and into the left neural foramen. This could represents (sic) organizing post-operative scar or hematoma. Also, based on the MRI report, discitis is possible at L5-S1, although less likely. Please correlate with patient's clinical profile and ESR. If there is concern for discitis/osteomyelitis, the patient may be referred for L5-S1 aspiration" (R. 205).

On October 17, 2006, Plaintiff presented to Dr. Yalamanchili. He had reviewed her October 2006 MRI and CT scan. He found they showed "granulation tissue at the previously operated site on the left side, effecting the left S1 nerve root." Plaintiff complained of continued pain in her left leg into her foot. Plaintiff's straight leg raising test was positive on the left at sixty (60) degrees; her Patrick's maneuver was negative; her gait was antalgic. Dr. Yalamanchili recommended Plaintiff undergo an "infection workup, including a CBC . . . because of the edema which may constitute infection, but which may just simply be postop changes." Dr. Yalamanchili "would not recommend further surgery" because "scar tissue only cause[d] creation of more scar tissue." He found it would be "worthwhile" for Plaintiff to be treated at a pain clinic. He prescribed Percocet (R. 281)[3].

Dr. Sherlekar, of the Capital Area Pain Management Associates, completed a consultative examination of Plaintiff on October 25, 2006, at the request of Dr. Yalamanchili. Plaintiff's chief complaint was for low back pain. Plaintiff described her pain as radiating down her left side to her toes. She complained of numbness, tingling, and "pins and needles sensation." Plaintiff's pain was continuous and eight on a scale of one-to-ten. Plaintiff stated her pain was aggravated by sitting,

---

[3]The record of evidence contains an undated Routine Abstract Form – Physical, which was addressed to Dr. Yalamanchili. The form was not completed; it is unsigned (R. 265-69).

standing, walking and exercising and it was relieved by lying down, resting and medications. Plaintiff's medications were listed as Percocet, Hydromorphone, Valium, Prevacid, Glucophage, Avandia, Glipizide (R. 324). Plaintiff's motor strength in her lower extremities was 5/5, her sensory examination of her lower extremities was normal, her reflexes were symmetrical and intact in both lower extremities. Plaintiff's gait was normal. Plaintiff had limited range of motion of her spine with pain. Plaintiff's facet loading signs were negative; she had pain on forward flexion. Plaintiff had no paravertebral tenderness; her Patricks test was negative; her sacroiliac loading test was negative; her straight leg raising test was negative. Dr. Sherlekar diagnosed lumbar radiculopathy with lumbar spondylosis and intractable pain associated with a post laminectomy syndrome. Dr. Sherlekar found Plaintiff would "benefit from selective transforaminal nerve blocks at L5-S1 on the left side." Dr. Sherlekar "put her on long acting opiates instead of her current regimen" of medication. Plaintiff was also prescribed Cymbalta to "help with her depression as well as the neuropathic pain" (R. 325).

On November 7, 2006, Plaintiff presented to the Shenandoah Valley Medical System with complaints of diabetes and back pain. Plaintiff described her back pain as moderate, intermittent, and sharp. Plaintiff's pain was aggravated by bending, sitting, and changing positions. It was relieved with the use of pain medications. Plaintiff reported she also experienced decreased mobility and radicular pain. She reported she was to report to the pain clinic in two weeks for treatment. Dr. Owunna observed no fever, fatigue, night sweats, shortness of breath, chest pain, palpitations, dysuria, hematuria, back pain or joint pain. Plaintiff was in no distress (R. 293, 295).

Upon examination, Dr. Owunna found Plaintiff's lumbar mobility was decreased. She had paravertebral muscle spasm and lumbosacral tenderness. Her flexion was normal; straight leg raising

was positive at forty-five (45) degrees "of L foot." Plaintiff's range of motion was moderately reduced. Her extremities appeared normal. Plaintiff's medications were listed as follows: Lortab, Glucophage, Glipizide, Avandia, Lopid, Combivent, Prevacid, Lantus, and aspirin. Dr. Owunna ordered blood work (R. 294, 296).

On November 13, 2006, Plaintiff received a selective nerve root block under fluoroscopy at left L5 at the Capital Area Surgery Center's Pain Management clinic. Dr. Ghauri administered the injection and "gave [Plaintiff] 60 pills of Dilaudid" (R. 323).

On November 27, 2006, Plaintiff received a selective nerve root block under fluoroscopy at left L5 at Capital Area Surgery Center. Dr. Budampati administered the injection. Plaintiff stated she had realized a four (4) percent improvement in pain and ADLs from her previous injection. Plaintiff was instructed to return for another injection, "if necessary" (R. 322).

On November 30, 2006, State agency reviewing physician Dr. Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 283-90). Dr. Lateef found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited. Dr. Lateef also noted he based these findings on Plaintiff's being able to stand/walk for about four hours in an eight-hour workday (R. 284). Dr. Lateef found Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds. Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl (R. 285). Plaintiff had no manipulative, visual or communicative limitations (R. 286-87). Dr. Lateef found Plaintiff should avoid concentrated exposure to extreme cold, vibration and hazards. He found Plaintiff's exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation

was unlimited (R. 287). Plaintiff's RFC was reduced (R. 290).

In making his findings, Dr. Lateef referred to the records of Plaintiff's April, 2006, L5-S1 discectomy; July 17, 2006, L5-S1 recurrent diskectomy; a left L5-S1 transforminal lumbar interbody fusion with posterior instrumentation and lateral arthrodesis with infuse and autograft; September 7, 2007, exploration of her arthrodesis, L5-S1 foraminotomy and replacement of her hardware, after which Plaintiff stated she had "immediate relief from leg pain and was ambulating without assistance and strength was 5/5"; and August 26, 2006, adult function report, in which Plaintiff asserted she used a heating pad on her back, cared for her child, and had difficultly with her personal care due to back pain. Dr. Lateef noted Plaintiff had failed back surgery, "but following surgery in 9/2006 she had good relief" (R. 288).

In addition to the above records, Dr. Lateef relied on the following records in making his finding: August 19, 2006, complaints of left foot pain and normal x-ray; August 1, 2006, finding that diabetes was poorly controlled; September 7, 2006, lumbar MRI that showed postoperative and degenerative changes, a recurrent disc protrusion at L5-S1, scarring at L5-S1 with mass effect, enhanced end plates at L5-S1, and possible spondylodiskitis; October 12, 2006, CT scan of lower spine that showed "large amount of soft tissue density material in the left side of the epidural space at" L5-S1, "extending into the left lateral recess, and into the left neural foramen"; October 10, 2006, lumbar MRI, which showed "extensive end plate edema and slight enhancement" of L5-S1 disc space, extensive "granulation tissue and/or epidural fibrosis at" L5-S1 "nerve roots" and "mild disc abnormalities" at L3-L4 and L4-L5; October 17, 2006, office notes of Dr. Yalamanchili, which contained assertions of Plaintiff that her pain continued "going down left leg and foot," negative straight leg raising test on the right and positive on the left at sixty (60) degrees, and antalgic gait and

Plaintiff's referral to a pain clinic (R. 290). He reviewed records up until October 2006, before Plaintiff went to the pain clinic.

On December 7, 2006, Plaintiff presented to Shenandoah Valley Medical Center with complaints of back pain. Plaintiff stated she had been "doing a lot of walking and bending in her job and her back pain [was] getting worse." Plaintiff stated she had been "going to pain clinic and ha[d] had 2 steroid shots." Plaintiff was unable to go to work on this date. Dr. Jones' examination of Plaintiff's back spine was "bilateral thoracic tenderness." (R. 297). Dr. Jones prescribed Diclofenac and Flexeril (R. 298).

Plaintiff received a selective nerve root block under fluoroscopy at left S1 and L5 at Capital Area Surgery Center's Pain Management clinic on December 11, 2006. Dr. Sherlekar performed the procedure. It was noted Plaintiff had a thirty (30) percent improvement in pain due to her previous nerve root block injection. Plaintiff was informed to return in two (2) weeks "for further evaluation and consideration for another injection if necessary (R. 321).

On December 22, 2006, Plaintiff returned to the Capital Area Surgery Pain Management Associates for a follow-up appointment. Plaintiff's chief complaint was low back pain. Plaintiff stated she realized "no pain relief . . . at all" from the "[s]elective nerve block performed under fluoroscopy at L5-S1." Plaintiff described her pain as continuous; was aggravated by sitting, standing, walking and exercising; was alleviated by applying heat. Plaintiff had no "new neurological signs since her last visit." Plaintiff's medicated with Glipizide, Glucophage, Hydromorphone, Prevacid, Kadian, and Cymbalta. Dr. Budampati noted Plaintiff was "independent with activities of daily living," and Plaintiff "verified" she was functional as a result of "use of . . . medications." Dr. Budampati diagnosed lumbar radiculopathy. Dr. Budampati recommended

Plaintiff undergo a spinal cord stimulation trial because she had "tried all other conservative treatment options before getting to this point" and she would "have good lon (sic) term pain relief with this option." Dr. Budampati refilled Plaintiff's prescriptions for Dilaudid and Kadian and provided information about the spinal cord stimulation trial. Plaintiff was instructed to continue exercising (R. 319-20).

On January 26, 2007, Plaintiff returned to the Capital Area Surgery Pain Management Associates for follow-up appointment for low back pain. Plaintiff's complaints and the doctor's opinions remained the same. He again diagnosed lumbar radiculopathy and again recommended Plaintiff undergo a spinal cord stimulation trial. Plaintiff reviewed the spinal cord stimulator information and had "not decied (sic) yet" to undergo the trial. (R. 317). Dr. Budampati prescribed Dilaudid and Kadian (R. 318).

On February 5, 2007, Plaintiff presented to the Shenandoah Valley Medical System with complaints of a "knot" in her upper left shoulder and anxiety. Plaintiff was alert and oriented and not anxious or depressed. Plaintiff was diagnosed with lipoma and instructed to return if it became large or painful (R. 291-92).

On February 23, 2007, Plaintiff returned to Capital Area Surgery Pain Management Associates for follow-up to a selective nerve block for low back pain. Plaintiff's complaints and the doctor's diagnosis and opinion remained the same. Plaintiff was diagnosed with lumbar radiculopathy. Dr. Budampati again found Plaintiff would "benefit from [s]pinal cord stimulation trial" but Plaintiff wanted to "try a TENS unit" first (R. 315). Plaintiff was instructed to "continue exercise." Her prescriptions were refilled (R. 316).

On April 11, 2007, State agency reviewing physician Dr. Cindy Osborne completed a

Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Osborne found Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for a total of about two hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push/pull unlimited (R. 327). Dr. Osborne found Plaintiff could never climb ladders, ropes or scaffolds but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl (R. 328). Plaintiff had no manipulative, visual or communicative limitations (R. 329-30). Plaintiff was unlimited in her exposure to extreme heat, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid concentrated exposure to extreme cold, wetness and vibration; Plaintiff should avoid even moderate exposure to hazards (R. 330). Dr. Osborne reduced Plaintiff's RFC to light "with walk/stand (sedentary) and other limitations as indicated" (R. 333).

On May 27, 2008, Plaintiff's non-attorney representative submitted additional medical records to the ALJ, which included the following May, 3, July 10, August 27, September 14, and October 10, 2007, examinations and treatment records of Dr. Struthers (R. 346).

On May 3, 2007, Plaintiff presented to Shenandoah Valley Medical System with complaints of back pain, diabetes and nervousness, due to a divorce. Plaintiff medicated with Aciphex, insulin, Combivent, Lantus and Kadian. Plaintiff reported no energy, sleep disturbances and being emotional (R. 347). Plaintiff's extremities appeared normal, with no edema or cyanosis (R. 348). Dr. Struthers prescribed Cyclobenzaprine, Gemfibrozil, Amitriptyline, Pregabalin, Metformin, Rabeprazole Sodium, Albuterol, Insulin Glargine, Morphine Sulfate, Promethazine, Diclofenac, Cyclobenzaprine, Gemfibrozil (R. 348-49).

On July 10, 2007, Plaintiff presented to Shenandoah Valley Medical System and was treated

21

by Dr. Struthers. Plaintiff complained of pain in her left elbow. Plaintiff's current medications were as follows: Lansaoprazole, Fluconazole, Pioglitazone, Mometasone, Metformin, Cyclobenzaprine, Gemfibrozil, Glipizide, Amitriptyline, Pregabalin, Rabeprazole Sodium, insulin, Albuterol Sulfate and Morphine Sulfate (R. 350). Dr. Struthers diagnosed tennis elbow and prescribed ibuprofen and heat to affected areas (R. 351).

Plaintiff presented to the Shenandoah Valley Medical System on August 27, 2008, and was treated by Dr. Struthers. Plaintiff's chief complaints were for "bruised tail bone" and diabetes. Plaintiff reported she had fallen down concrete steps. Plaintiff's medications were listed as follows: Metaformin, Lansoprazole, Pioglitazone, Nometasone, Cyclobenzaprine, Gemfibrozil, Albuterol Sulfate and Morphine Sulfate (R. 352). Upon examination, Plaintiff was in no acute distress; her extremities were normal (R. 353). Dr. Struthers ordered blood work. She prescribed Veetids, insulin, Glucophabe, Prevacid, Diflucan, Actos, Nasonex, Lyrica, Glucotrol, Amitriptyline, Flexeril, Lopid, Aciphex, Lantus, Combivent and Kadian (R. 354).

On September 6, 2007, Dr. Ansel completed a psychological evaluation of Plaintiff. Plaintiff reported she was disabled because she had undergone three back surgeries and her back was "still not right." Plaintiff stated this situation caused her to be "unsuccessful at her last three attempts at employment in factory work." Plaintiff reported back and bilateral lower extremity pain. Plaintiff reported being depressed "continuously . . . for the past five or six months, due to her health problems and resulting functional limitations." She isolated herself, had crying spells, had loss of interest, misplaced things, felt guilty and worthless, had decreased energy, had decreased concentration, and had sad mood. Dr. Ansel diagnosed panic disorder with agoraphobia, moderate, and adjustment disorder with mixed anxiety and depressed mood. Dr. Ansel found Plaintiff was

"suffering from increasing agoraphobia and has pain resulting from orthopedic problems that requires narcotic medication. As a result, the examiner believes that she is incapable of participating in substantial gainful employment and has been terminated from three or four jobs because of slow performance" (R. 334-36).

On September 14, 2007, Plaintiff presented to Shenandoah Valley Medical Center with complaints of tail bone injury and diabetes. She was examined by Dr. DeLanoy. Plaintiff informed Dr. DeLanoy that she was applying for disability due to her multiple back surgeries and that she'd seen a psychologist last week. Plaintiff stated that when she gets "mad or upset," she gets muscle spasms (R. 355). Plaintiff's physical exam was normal. Dr. DeLanoy prescribed Valium, Lantus, Insulin, Veetids, Glucophage, Prevacid, Actos, Nasonex, Flexeril, Lopid, Combient, Lunesta, and Kadian (R. 356-57).

On October 10, 2007, Plaintiff presented to Shenandoah Valley Medical System and was treated by Dr. Struthers. Plaintiff's complaints were for panic attacks, tail bone pain and diabetes (R. 358). Dr. Struthers referred Plaintiff to Dr. Milbourne for her anxiety. She prescribed Celexa. Plaintiff was prescribed Valium, Glucophage, Citalopram, Actos, Prevacid, Lopid, Lantus, Nasonex, Flexeril, and Combivent (R. 359).

On April 22, 2008, a provider from the Capitol Area Pain Management Associates completed a Medical Source Statement of Ability to do Work-Related Activities. It was submitted to the ALJ by Plaintiff's non-attorney representative on May 12, 2008 (R. 337). The provider found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand/sit for less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday and needed to periodically alternate sitting and standing (R. 342-43). Plaintiff had no

limitations regarding her pulling and pushing. The evaluator based these limitations on a diagnosis of lumbar radiculopathy and post laminectomy syndrome. It was noted Plaintiff medicated with Kadian, Dilaudid, and Flexeril. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds. She could occasionally balance, kneel, crouch, crawl and stoop. These postural limitations were based on Plaintiff's low back pain increasing if the postural activities were "prolonged" (R. 343). Plaintiff would be unlimited in her ability to reach in all directions and her gross manipulation; however, she could only occasionally finger and feel. The evaluator supported this finding by noting Plaintiff "had ulnar nerve surgery in both arms," which caused "decreased feeling in both hands." Plaintiff had no visual or communicative limitations (R. 344). He also found Plaintiff was unlimited in her exposure to temperature extremes, noise, dust, vibrations humidity and wetness, hazards, fumes, odors, chemicals and gases (R. 345).

On May 12, 2008, Plaintiff's non-attorney representative provided treating physician Dr. Struthers' Medical Source Statement of Ability to do Work-Related Activities to the ALJ (R. 337-41). Dr. Struthers opined Plaintiff could occasionally lift ten pounds, could stand and/or walk less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday, and push/pull with her lower extremities with limitations. Dr. Struthers did not make a finding as to how much Plaintiff could frequently lift and/or carry (R. 338-39). Dr. Struthers found degenerative disc disease and neuropathy due to diabetes caused these limitations. Dr. Struthers found Plaintiff could occasionally *and* never climb ramps, stairs, ladders, ropes, and/or scaffolds; could occasionally balance and stoop; and could never crouch, crawl or stoop (R. 339). Dr. Struthers did not make any findings as to Plaintiff's manipulative, visual, or communicative limitations (R. 340-41).

24

<u>Administrative Hearing</u>

Plaintiff testified at the May 13, 2008, administrative hearing that she lived with her fourteen-year old daughter and boyfriend (R. 25). Plaintiff testified that she did not drink or smoke. Plaintiff had her GED (R. 27).

Plaintiff testified her past work was that of a "picker" for General Motors. Because the company was closing automotive plants and her being laid off was possible, Plaintiff "took a buyout" in March, 2005, and received that buyout ($70,000.00) in June, 2006 (R. 28-29). Plaintiff stated she had received Worker's Compensation in 2002 or 2003 due to tennis elbow (R. 30). Plaintiff stated that she frequently lifted fifty (50) pounds at the General Motors job (R. 32).

Plaintiff stated tennis elbow caused pain, and she had had two surgeries for this condition. Plaintiff stated the "strap" worn to treat tennis elbow had not helped her (R. 31). Plaintiff testified that her diabetes was not under control and caused her to be fatigued. Plaintiff testified she experienced stress because she could not work and she would "like to work." Plaintiff stated she felt worthless because she could not work and that she did not "like going out around a lot of people" because of the pain in her back (R. 38). Plaintiff was being treated for stress by a psychiatrist; she was medicating with Klonopin. Plaintiff stated she had been experiencing panic attacks for the past twelve (12) or eighteen (18) months. Plaintiff stated her pain was constant, throbbing, and uncontrolled. Plaintiff testified that her pain was "still bad now but with the pain medication that [she was] taking it control[ed] it to a certain extent but it [didn't] control [the pain] all the time" (R. 56).

Plaintiff testified she could walk "maybe two blocks" and could sit for less than two (2) hours then she had to stand up or lie down (R. 32, 37, 49). Plaintiff then testified that she could sit for

twenty (20) or thirty (30) minutes at a time. Plaintiff stated she had had difficulty with fingering or

feeling for the past year due to nerve damage (R. 37). Plaintiff could drive for short periods of time

and could drive when she "wish[ed]." Plaintiff stated she did not awake at the same time each day

(R. 34). She did not assist her daughter in preparing for school. Plaintiff did very few "chores"

around the house. She testified she would "start something and not finish it." Plaintiff stated her

boyfriend did all the cooking and had for the past eight (8) or nine (9) months (R. 35). Plaintiff

testified she could stand for "maybe a half an hour at the most" (R. 36).

Upon examination by her non-attorney representative, Plaintiff stated that, as of her April,

2006, amended onset date, she could "do a load of laundry" or dishes (R. 53). Plaintiff testified that

her mother, daughter and son helped her with her inside and outside chores in April, 2006 (R. 55).

Plaintiff could "start dishes but" she would "never get them done"; she did no cooking (R. 55-56).

Plaintiff testified she was medicating with Kadian, Dilaudid, Klonopin, insulin, Lopid,

Actosplus, "Biatapin (Phonetic)" and "Gumporamad (Phonetic)" (R. 33). Plaintiff's non-attorney

representative informed the ALJ that Plaintiff medicated with ten or twelve medications at the time

of the administrative hearing. The representative was instructed to provide a current medication

list to the ALJ after the hearing as well as to provide medical records for "after February 2007" from

Plaintiff's primary care physician and the pain management physicians to the ALJ. The ALJ noted

he was "missing about a year of their" medical records (R. 40). [4]

Plaintiff testified that her pain medications made her "tired" and caused her to nap, which

she did, two (2) or three (3) times a day for an hour or an hour and a half each nap (R. 36). Plaintiff

---

[4]These records were submitted as directed, and the undersigned has included them in the
Facts section in chronological order.

testified she was unable to use the spinal stimulator because she could not feel her legs. She testified the TENS unit did not alleviate her pain "a lot" (R. 33).

The ALJ asked the VE the following hypothetical question:

> For the hypothetical I want you to assume the age, education and work experience of the claimant. I want you to assume she's been diagnosed with degenerative disk disease, insulin dependent. . . . Lumbar radiculopathy, tennis elbow, panic disorder and adjustment disorder. I want you to assume that because of a combination of these impairments she's limited to lifting five pounds frequently, ten pounds occasionally. Sitting six hours and standing two. She can crouch, kneel, crawl and stoop only five percent of the time. She would require a sit/stand option. It would require her to stand in place for two minutes every two hours. I would also limit her because of the combination of her impairments to simple, routine tasks, slow pace. This hypothetical takes into consideration mild to moderate pain and side effects of her medication. Based on this hypothetical I assume she could perform none of her past relevant work (R. 43-44).

The VE responded in the affirmative and stated that "[t]his would allow her to perform no more than sedentary and her past work was in excess of that." The ALJ then asked the VE if there were any other jobs that such a hypothetical person could perform. The VE responded that such a hypothetical person could perform the following entry-level or unskilled sedentary occupations that are routine, repetitive: general clerical position – 11,000 in the tri-state area and over 360,000 in the national economy; inspector – 1,100 in the tri-state area and 55,000 in the national economy; cashier – 19,000 in the local economy and 200,000 in the national economy (R. 44).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Hauser made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010 (R. 14).

2.    The claimant has not engaged in substantial gainful activity since April 11,

2006, the amended onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*) (R. 14).

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar spine with radiculopathy, a tennis elbow, a panic disorder, and an adjustment disorder (20 CFR 404.1520(c)) (R. 14).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 15).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). Specifically, she can lift/carry five pounds frequently, ten pounds occasionally, sit for six hours in an 8-hour workday but must be able to alternate positions for at least two minutes during a two-hour period, and stand and walk for two hours in an 8-hour workday from an exertional standpoint. Nonexertionally, she can understand, remember and carry out simple, routine, slow-paced tasks and instructions due to symptoms of pain and medication side-effects. She can tolerate crouching, crawling, kneeling, and stooping five percent of the time (R. 16).

6.      According to vocational expert testimony, the claimant is unable to perform any past relevant work (20 CFR 404.1565) (R. 18).

7.      The claimant was born on March 26, 1966 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged onset date (20 CFR 404.1563) (R. 18).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 18).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 19).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566) (R. 19).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 11, 2006 through the date of this decision (20 CFR 404.1520(g)) (R. 19).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.  Both of plaintiff's physicians, her long time PCP and Pain Management Specialist (sic) opined that she was not able to work on an 8 hour a day, day after day, basis due to "intractable" pain.  No examining physician contradicts these opinions, and the Agency (sic) chose not to have plaintiff evaluated by a Consultative Examiner (sic) (Plaintiff's brief at pp. 2 and 6).

2.  The ALJ improperly rejected the uncontradicted opinions of these two treating physicians, which are consistent with plaintiff's history of multiple surgeries, physical therapy, pain medication injections, and prescribed oral morphine.  The ALJ's rejection of this evidence is based on lack of "objective" evidence, which is not consistent with the evidence or Fourth Circuit case law, and the *assumption*, without foundation, that her physicians uncritically accepted her complaints. The ALJ's failure to appropriately address this evidence requires that the case be remanded for reconsideration (Plaintiff's brief at pp. 2 and 9).

3.  The above error leads to the other: having failed to appropriately weigh the evidence, the ALJ's residual functional capacity ("RFC") is inadequate and concomitant hypothetical question to the Vocational Expert (sic) ("VE") is "inaccurate" as a matter of law, also requiring that the case be remanded (Plaintiff's brief at pp. 2 and 14).

The Commissioner contends:

1.  The ALJ properly weighed the opinions of record (Defendant's brief at p. 8).

2.  Substantial evidence supports the ALJ's credibility assessment (Defendant's brief at p. 12).

3.  Substantial evidence supports the ALJ's RFC finding and corresponding hypothetical to the vocational expert (Defendant's brief at p. 13).

## C.  Opinion Evidence

Plaintiff first argues that both of plaintiff's physicians, her long time treating physician, and her Pain Management Specialist opined that she was not able to work on an 8 hour a day, day after day, basis due to "intractable" pain.  No examining physician contradicts these opinions, and the

Agency (sic) chose not to have plaintiff evaluated by a Consultative Examiner. Defendant contends that the ALJ properly weighed the opinions of record.

20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
> >
> > > (I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer

31

a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

On April 22, 2008, a source[5] from the Capitol Area Pain Management Associates completed a Medical Source Statement of Ability to do Work-Related Activities, which was submitted to the ALJ prior to the hearing (R. 337). The source found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand/sit for less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday and needed to periodically alternate sitting and standing (R. 342-43). Plaintiff had no limitations regarding her pulling and pushing. These limitations were based on Plaintiff's diagnosis of lumbar radiculopathy and post laminectomy

_____

[5]Defendant refers to this source as a Physician's Assistant, while Plaintiff refers to him as a physician or treating source. The ALJ does not mention this assessment or the source at all; therefore the Court cannot determine from the decision what type of provider the individual is.

syndrome. It was noted Plaintiff medicated with Kadian, Dilaudid, and Flexeril. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds. She could occasionally balance, kneel, crouch, crawl and stoop. These postural limitations were based on Plaintiff's low back pain increasing if the postural activities were "prolonged" (R. 343). Plaintiff was unlimited in her ability to reach in all directions and her gross manipulation. She could only occasionally finger and feel, however based on her past ulnar nerve surgery in both arms, which caused "decreased feeling in both hands." Plaintiff had no visual or communicative limitations (R. 344). Plaintiff was unlimited in her exposure to temperature extremes, noise, dust, vibrations humidity and wetness, hazards, fumes, odors, chemicals and gases (R. 345).

It is undisputable that Plaintiff was treated at Capital Area Pain Management for her pain. Dr. Sherlekar completed a consultative examination of Plaintiff on October 25, 2006, at the request of Dr. Yalamanchili. Dr. Sherlekar diagnosed lumbar radiculopathy with lumbar spondylosis and intractable pain associated with a post laminectomy syndrome. He found Plaintiff would "benefit from selective transforaminal nerve blocks at L5-S1 on the left side." Dr. Sherlekar "put her on long acting opiates instead of her current regimen" of medication and also prescribed Cymbalta to "help with her depression as well as the neuropathic pain."

On November 13, 2006, Plaintiff received a selective nerve root block. Dr. Ghauri administered the injection and "gave [Plaintiff] 60 pills of Dilaudid" (R. 323).

On November 27, 2006, Plaintiff received another selective nerve root block. Dr. Budampati administered the injection. Plaintiff stated she had realized a four (4) percent improvement in pain and ADLs from her previous injection. Plaintiff was instructed to return for another injection, "if necessary" (R. 322).

On December 11, 2007, Plaintiff received yet another selective nerve root block. Dr. Sherlekar performed the procedure. It was noted Plaintiff had a thirty (30) percent improvement in pain due to her previous nerve root block injection. Plaintiff was informed to return in two (2) weeks "for further evaluation and consideration for another injection if necessary" (R. 321).

On December 22, 2006, Plaintiff stated she had realized "no pain relief . . . at all" from the last nerve block. She described her pain as continuous; was aggravated by sitting, standing, walking and exercising; was alleviated by applying heat. Dr. Budampati noted Plaintiff was "independent with activities of daily living," and Plaintiff "verified" she was functional as a result of "use of . . . medications." Dr. Budampati diagnosed lumbar radiculopathy and recommended Plaintiff undergo a spinal cord stimulation trial because she had "tried all other conservative treatment options before getting to this point" and she would "have good lon (sic) term pain relief with this option." Dr. Budampati refilled Plaintiff's prescriptions for Dilaudid and Kadian and provided information about the spinal cord stimulation trial. Plaintiff was instructed to continue exercising (R. 319-20).

On January 26, 2007, Plaintiff returned to Capital follow-up. Her complaints and the findings were the same as for five weeks earlier, except that Plaintiff reported "inadequate analgesia on the current regimen as she started work recently." Plaintiff reviewed the spinal cord stimulator information and had "not decied (sic) yet" to undergo the trial implant. (R. 317). Dr. Budampati prescribed Dilaudid and Kadian (R. 318).

On February 23, 2007, Plaintiff returned to Capital follow-up to a selective nerve block for low back pain. She again reported she "had no pain relief with the procedures at all." Dr. Budampati again found Plaintiff would "benefit from [s]pinal cord stimulation trial," noting she had "tried all other conservative treatment options before getting to this point." Plaintiff wanted to "try

a TENS unit" first.

There are several problems with the Medical Source Statement from Capital Area Pain Management, according to Defendant. The first is that it is signed by a Physician's Assistant, not considered an "acceptable medical source" under the Regulations. Pursuant to 404.1513 sources who can establish a medically determinable impairment must be "acceptable medical sources." A physician's assistant is not considered an "acceptable medical source," although he or she is expressly listed as a "medical source." 404.1513(d) states that the ALJ may use evidence from medical sources to show the severity of the plaintiff's impairments and how they affect her ability to work.

Secondly, Defendant argues that the record does not contain evidence that the physicians' assistant, Carlton McClellan, ever examined Plaintiff. All the records show she was seen by Dr. Sherlekar, Dr. Budampati, or Dr. Ghauri, none of whom filled out a Medical Source Statement.

Although Defendant may very well be correct in both his arguments, neither was made by the ALJ. Defendant argues the ALJ "properly weighed the assessment submitted by Mr. McClellan." There is, however, simply no mention whatsoever of this Medical Source Statement in the ALJ's decision. There is therefore no indication if the ALJ weighed the assessment at all, and, if he rejected it, his reasons for doing so. In fact, the undersigned was unable to determine from the record Mr. McClellan's job title, and has only Defendant's representation on which to rely. Further, that representation was not made based on the record, but apparently on the web site for Newbridge Spine. The undersigned does not doubt that Defendant is correct, but believes, again, this should have been addressed by the ALJ, not the U.S. Attorney's office.

On May 12, 2008, Plaintiff's long-time treating primary care provider, Dr. Struthers,

submitted a Medical Source Statement of Ability to do Work-Related Activities (R. 337-41). Dr. Struthers opined Plaintiff could occasionally lift ten pounds, could stand and/or walk less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday, and push/pull with her lower extremities with limitations. Dr. Struthers did not make a finding as to how much Plaintiff could frequently lift and/or carry (R. 338-39). Dr. Struthers found degenerative disc disease and neuropathy due to diabetes caused these limitations. Dr. Struthers found Plaintiff could occasionally *and* never climb ramps, stairs, ladders, ropes, and/or scaffolds; could occasionally balance and stoop; and could never crouch, crawl or stoop (R. 339). Dr. Struthers did not make any findings as to Plaintiff's manipulative, visual, or communicative limitations (R. 340-41).

It is undisputed and undisputable that Dr. Struthers is Plaintiff's treating physician since at least 2004. The ALJ clearly did not give Dr. Struthers controlling weight. He was therefore required to apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii), and (d)(3) through (d)(6) of 404.1527 in determining the weight to give Dr. Struther's opinion. Further, "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 404.1527(d)(2).

Additionally, Social Security Ruling ("SSR") 96-2p provides precise requirements for the explanation of the weight given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore[,] [w]hen the determination or decision . . . is a denial . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Here, the ALJ's decision states only:

> The medical source statement submitted by Dr. Struthers, dated May 12, 2008, cannot be given great weight and adopted in this assessment because his assessment is not consistent with his treatment notes but appears to be based on the claimant's subjective complaints.

(R. 18). The undersigned finds this analysis does not comply with 404.1527's or SSR 96-2p's requirement that the determination give good reason for the weight given the treating source's opinion.

The undersigned therefore finds substantial evidence does not support the weight accorded Dr. Struther's opinion nor his failure to discuss in any manner the opinion from Capital.

## D.  RFC and Hypothetical to the VE

Plaintiff argues that the ALJ's failure to properly weigh the two treating source opinions leads to his RFC and resulting hypothetical to the Vocational Expert also being inadequate and inaccurate.  Defendant argues that the ALJ's RFC "accounted for all functional limitations attributable to Plaintiff's limitations that were credibly supported by the record."  Both Dr. Struthers and Capital opined that Plaintiff would be limited to fewer than six hours sitting and fewer than two hours standing.  She could therefore not work an eight-hour day, if those limitations were found to be supported.  As already found, however, the ALJ's explanation (or insufficiency thereof) of the weight accorded these opinions is not substantially supported by the evidence.  His RFC and the resulting hypothetical are therefore also not substantially supported by the evidence.

The undersigned also finds the RFC and hypothetical themselves problematic, although this was raised by neither party.  The hypothetical the ALJ asked the VE is, in pertinent part:

> I want you to assume that because of a combination of these impairments she's limited to . . . [s]itting six hours and standing two.  She would require a sit/stand

option.  It would require her to stand in place for two minutes every two hours.

(Emphasis added). The RFC upon which this hypothetical was based, however, provides, in pertinent part:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a).  Specifically, she can . . . sit for six hours in an 8-hour workday but must be able to alternate positions for at least two minutes during a two-hour period, and stand and walk for two hours in an 8-hour workday from an exertional standpoint.

(Emphasis added).  While some may consider the difference between the two a matter of mere semantics, the undersigned finds a vast difference between being able to sit for two hours straight before being permitted to stand in place for two minutes, or being able to alternate positions at will for at least two minutes during a two-hour period of sitting.

For this additional reason, the undersigned finds the RFC and the hypothetical to the VE are not supported by substantial evidence.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment [Docket Entry 15 ]be **DENIED**, and the Plaintiff's Motion for Summary Judgment [Docket Entry 13] be **GRANTED** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation; and that this action be **DISMISSED and RETIRED** from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _2_ day of _August_, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE